**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

DEBORAH WASHINGTON,

Plaintiff,

v.                                                    CASE NO. 1:23-CV-518-HAB

DANA LIGHT AXLE PRODUCTS, LLC,

Defendant.

## OPINION AND ORDER

Plaintiff Deborah Washington ("Washington"), an African-American woman, brought suit in state court under Title VII of the Civil Rights Act, 42 U.S.C. §2000e, et seq. ("Title VII") alleging she endured racial discrimination and retaliation while employed by Dana Light Axle Products, LLC ("Dana"). Dana removed the case and then moved for summary judgment. Washington did not respond and the time to do so has passed. For the reasons below, Dana's motion will be GRANTED.

## STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable [factfinder] could [find] for the [non-moving] party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The non-moving party is required to marshal and present the court with the evidence [they] contend will prove [their] case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The non-moving party must do more than simply claim that "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In essence, the non-moving party must respond to the moving party's motion by "identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir. 2017). The Court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the Court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id*.

## **BACKGROUND**

Since Washington did not oppose the motion for summary judgment,[1] the Court accepts the unopposed facts as true. They are as follows:

In September 2021, Washington began working a part-time job at Dana. (Statement of Material Facts, ECF No. 35 at ¶ 11, hereafter "SMF at ¶ _"). Three months later, Dana hired her as a full-time grinder operator in Department 110. (*Id*.) After Department 110 temporarily shut down[2], she transferred to Department 152 and still currently works in that Department. (*Id*. ¶ 12). During her time in Department 110, Greg Parrish ("Parrish"), a black man, supervised Washington, and the rest of Department 110. (*Id*. ¶ 13). Don Radar ("Radar") served as Washington's Production Manager. (*Id*.)

Throughout her time with Dana, Washington has encountered a few minor performance-related hiccups. (*Id*. ¶ 18.) On May 24, 2022, another supervisor, Keith Stroud ("Stroud"), issued a verbal warning to Washington regarding her poor attendance. (*Id*. ¶ 19). On February 3, 2023,

---

[1] At the time Washington filed her lawsuit, she was represented by counsel. After the filing of Dana's motion for summary judgment, counsel moved to withdraw from the case. (ECF 41). The Court granted counsel's motion (ECF 45) and advised plaintiff of the pending motion. She was given additional time to respond to the motion for summary judgment but did not. *Id*.

[2] Department 110 is now fully closed. (SMF ¶ 38).

Stroud issued another verbal warning, this time for Washington's failure to timely turn in her hourly sheets and adhere to group standards. (*Id*. ¶ 20). These verbal warnings were not the only issues Washington and Dana clashed on.

A month after being hired full-time, Washington began dating and living with fellow employee, Roderick Hines ("Hines"). (*Id*. ¶ 22). Their relationship came to an end in October 2022 (*id*.), but the drama from their relationship extended into the workplace. Sometime in 2022, Washington reported to Dana's Senior Human Resources Generalist Sara Layson ("Layson") that Parrish made an "uncomfortable" comment about Washington's relationship with Hines. (*Id*. ¶ 23).[3] Layson investigated, including asking Parrish directly about his alleged comment, which he adamantly denied. (*Id*.)

Layson investigated another complaint from Washington in mid-August 2022. (*Id*. ¶ 24). This complaint alleged that Parrish harassed Washington after allegedly disciplining her for making "43 bad parts" during work. (*Id*.) Layson investigated and concluded that Parrish did not, in fact, discipline Washington as the record reflects no write-ups. Then in January 2023, Washington again complained about Parrish, this time saying he issued three "unfounded" write-ups for allegedly making bad parts. (Am. Compl., ECF 22-1 at p. 2, "Am. Comp. at ¶__").

About this same time (January 2023), Dana experienced a decrease in customer demand which caused it to shut down Department 110 for the entire second shift. (SMF ¶ 27). Because of this decrease in customer demand, Dana changed production requirements from 2,500 pieces per week to a maximum of 1,000 pieces. (*Id*.) When the line shut down, Dana gave Washington the option to have a no-work pass where she could choose to go home, and it would not count against her attendance requirements. (*Id*. ¶ 28). Washington declined this offer. (*Id*. ¶ 29). Instead, she

---

[3] Dana's harassment policy provides multiple reporting options, including contacting Dana's helpline, a supervisor, Human Resources, or any member of management. (*Id*. ¶ 21).

opted to perform other duties needed at Dana, including cleaning, and wiping down walls. (*Id*. ¶ 30). Washington maintained her regular wage, kept her same hours, and even received overtime pay while performing these duties. (*Id*. ¶ 29). Washington also testified this line of work was easier than her previous job. (*Id*. ¶ 31).

After a week of temporary duties, new job allocations were made throughout Dana. (*Id*. ¶ 33). Because a second-shift machine was taken, Dana gave Washington and the other employees opportunities to bid for the machine they wanted in Department 152 based upon their seniority and pursuant to Dana's Collective Bargaining Agreement ("CBA"). [4] (*Id*.) Washington chose the "line five" grinder. (*Id*.)

At some point thereafter, Dana's production demand increased, and Department 110 re-opened. Because Washington was already the sole operator of a different grinder in Department 152, Stephen Watkins ("Watkins"), a white male, bid for the Department 110 grinder that Washington previously operated. (*Id*. ¶ 35). Washington never requested to return to the Department 110 grinder once the position reopened. (*Id*. ¶ 37). In fact, Washington testified that she liked her job at the "line five" grinder. (ECF 35-3 at p. 23). She did not experience any lost wages or benefits during this time. (ECF 35-3 at p. 30).

All that notwithstanding, Washington alleges that Radar removed her from her line and shut down her shift because of her race and in retaliation for reporting her perceived harassment to Dana. (Am. Comp. ¶¶ 9–10). She claims to have been removed from her position several times for "no valid reason," and claims that her work was given to other workers that Dana allowed to stay beyond their regular working hours to finish. (*Id*. ¶¶ 11–12).

---

[4] Layson's declaration discusses Dana's Collective Bargaining Agreement, which clearly outlines situations like the one discussed above when Dana removes or adds "manpower," or workers, and what happens afterward. (ECF 35-1, p. 4).

Washington filed a Charge of Discrimination ("Charge") with the Fort Wayne Metropolitan Human Relations Commission on February 7, 2023. (SMF, ¶ 7). In her Charge, she asserted claims for race discrimination and retaliation based upon her protected activity.

## DISCUSSION

Consistent with her Charge, Washington's complaint alleges that she experienced race discrimination when Dana shut down the second shift of Department 110 and retaliation after she complained of harassment by her supervisor. When considering summary judgment on these types of claims under Title VII, the "singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020)). To answer that question, the Court looks at the evidence holistically. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *see also Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016) ("[A]ll evidence belongs in a single pile and must be evaluated as a whole.").

Dana moves for summary judgment on both the discrimination and retaliation claims contending that it did not take any materially adverse action against Washington and, even if it did, Washington could not establish a presumption of discrimination or retaliation under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). It also asserts that she has no evidence, even when all the facts are considered together, to overcome summary judgment. The Court agrees.

Regardless of the evidentiary methodology employed, the result is the same – no reasonable juror could conclude that Dana discriminated against Washington. Perhaps the most

damning reason is the fact that Washington has not demonstrated that she suffered any adverse employment action by Dana. "Materially adverse actions include termination, demotion accompanied by a decrease in pay, or a material loss of benefits or responsibilities, but do not include everything that makes an employee unhappy." *Hackett v. City of S. Bend,* 956 F.3d 504, 508 (7th Cir. 2020) (quoting *Crews v. City of Mt. Vernon*, 567 F.3d 860, 869 (7th Cir. 2009) (internal citations omitted)). Actions involving a transfer or reassignment of job responsibilities are typically not materially adverse unless there is a "significant alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects." *Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2009).

Dana argues that its temporary closure of Department 110, while certainly a change in Washington's employment – was not a material one. Dana points out that Washington was not singled out during this closure; the entire second shift was shut down due to decreased production demand. Moreover, Dana offered a no-work pass to employees or temporary replacement employment during the closure. Shortly thereafter, Dana reassigned the second shift employees to other jobs through the bid process called for by the terms of the CBA. At no time during this period, did Washington receive reduced pay, altered hours or benefits. Rather, she experienced a temporary change of responsibilities that did not result in any tangible or material change to her employment terms. See *Malone v. Norfolk S. R.R.*, 2004 WL 3250125, at *5 (S.D. Ind. Dec. 15, 2004) ("an adverse employment action involves more than simply an alteration of job responsibilities or an inconvenience to the employee.")

But even if the alteration of her job duties could be a materially adverse action, Dana asserts that Washington cannot establish that this action was a pretext for either race discrimination or retaliation. This too, is a winning argument. Dana produced evidence that it shut down the

second shift of Department 110 due to decreased production, which qualifies as a legitimate, nondiscriminatory and nonretaliatory reason. For Washington to establish pretext and overcome summary judgment on either her discrimination or retaliation claims, she must produce some evidence calling this reason into question – not to mention producing evidence that the real reason for the decision is discrimination or retaliation. *McDonnell Douglas*, 411 U.S. at 804. But Washington failed to do so. Her failure to oppose the motion leaves her with nothing before the Court that suggests that Dana's shutting down the second shift and reassigning her position was predicated on her race or in retaliation for her complaints about Parrish. Dana's Motion for Summary Judgment is, therefore, GRANTED.

## CONCLUSION

For the reasons above, Dana's motion for summary judgment (ECF 33) is GRANTED. The Clerk is directed to enter judgment in favor of the Defendant.

**SO ORDERED** on June 23, 2026.

/s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT